NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

|                                        |     |                                   |
| :------------------------------------- | :-- | :-------------------------------- |
|                                        | :   |                                   |
| ALTICE USA, INC.                       | :   |                                   |
|                                        | :   |                                   |
| Plaintiff,                             | :   |                                   |
|                                        | :   | Case No. 3:19-cv-21371-BRM-ZNQ    |
| v.                                     | :   |                                   |
|                                        | :   | **OPINION**                       |
| NEW JERSEY BOARD OF PUBLIC             | :   |                                   |
| UTILITIES, *et al.*,                   | :   |                                   |
|                                        | :   |                                   |
| Defendants.                            | :   |                                   |
|                                        | :   |                                   |

---

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiff Altice USA, Inc.'s ("Altice") Motion for Reconsideration (ECF No. 18)[1] of this Court's December 23, 2019 Order (ECF No. 14) dismissing this case for lack of subject matter jurisdiction. Defendants New Jersey Board of Public Utilities ("BPU"), its president Joseph L. Fiordaliso ("President Fiordaliso"), and its four commissioners Mara-Anna Holden, Dianne Soloman, Upendra J. Chivukula, and Bob M. Gordon (all individual Defendants collectively, "Board Members") (Board Members and BPU collectively, "Defendants") oppose the motion. (ECF No. 19.) Having reviewed the parties' submissions filed in connection with the motion (ECF Nos. 1-10, 8, 11, 18-1, 19, & 22) and having heard oral argument pursuant to Federal Rule of Civil Procedure 78(a) on January 10, 2020, for the reasons set forth below and for good cause having been shown, the Court treats Altice's Motion for Reconsideration as a Motion for Preliminary Injunction,[2] and Courts will **GRANT** Altice's motion as to the Board

---

[1] Altice filed its motion for reconsideration pursuant to the Court's order of December 30, 2019. (ECF No. 16.)

[2] Defendants argue that Altice's motion for a preliminary injunction is not properly before the Court.

Members (subject to Altice posting a $2.11 million bond) and **DENY** the motion as to BPU.

## I. FACTUAL AND PROCEDURAL BACKGROUND

BPU is a New Jersey state agency composed of five full-time board members (collectively "Board Members"), one of whom serves as president. N.J. Stat. Ann. §§ 48:2-1, -1.1. New Jersey's Cable Television Act vests BPU with the authority to regulate cable television companies. *See id.* § 48:5A-9(b). One of BPU's rules requires that "initial and final bills [for cable television services] shall be prorated as of the date of the initial establishment and final termination of service." N.J. Admin. Code § 14:18-3.8(c) (the "Prorated Bill Rule").

"Altice provides cable television, Internet, and telephone services to millions of customers in twenty-one states, including New Jersey." (ECF No. 17 ¶ 1.) Altice is the successor-in-interest to Cablevision, another provider of cable television services in New Jersey. (ECF No. 17-2, at 13.) In 2011, BPU waived Cablevision's obligation to comply with the requirements of the Prorated Bill Rule, subject to certain conditions. (ECF No. 17-1, at 6-7.) In October 2016, Altice—apparently relying on the 2011 waiver BPU granted to Cablevision —"implemented a policy of not providing prorated refunds to customers who contact Altice and request to cancel their cable services." (ECF No. 17-3 ¶ 2.)

After providing Altice notice of its impending action and an opportunity to comment, BPU found that Altice's policy violated both (1) BPU's 2011 order waiving Cablevision's obligation to comply with the Prorated Bill Rule and (2) BPU's 2016 order approving Altice's takeover of Cablevision. (ECF No. 17-7, at 7-9.) On November 23, 2019, BPU ordered Altice to begin prorating its cable customers bills when customers initiated or terminated service in the middle of a billing cycle, to provide refunds of non-prorated bills to affected customers, to make a one-time $10,000 charitable contribution, and to conduct an audit of its customers' bills since

October 2016 to determine which customers are entitled to partial refunds.  (ECF No. 17-7, at 9.)

Altice filed a Complaint in this Court against BPU and its President Fiordaliso, asking for this Court to enjoin enforcement BPU's order of November 23, 2019 on the grounds that (1) the order was pre-empted by the federal Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.*  ("Cable Act"), and (2) the order violated various provisions of state law.  (ECF No. 1, at 30-31.)  This Court dismissed the complaint, holding that (1) sovereign immunity barred the action against BPU, and (2) Altice's claimed exception to sovereign immunity—the exception for actions against state officials seeking prospective injunctive relief to end an ongoing or continuing violation of federal law—did not apply because any injunction would bind only President Fiordaliso, not the remaining Board Members, and therefore could not provide effective relief.  *Altice, Inc. v. N.J. Bd. of Pub. Utils.*, Civ. No. 19-21371, 2019 WL 7047207, at *1-3 (D.N.J. Dec. 23, 2019).

Altice requested (ECF No. 15), and this Court permitted (ECF No. 16), Altice to file an amended complaint naming all Board Members.  After filing its amended complaint (ECF No. 17), Altice subsequently moved the Court to reconsider its earlier decision.  (ECF No. 18.)  Altice's amended complaint brings four claims.  First, Altice brings what it styles as an "Action in Equity for Declaratory and Injunctive Relief to Enjoin Unlawful State Action in Violation of the Federal Cable Act."[3]  (ECF No. 17, at 24.)  Second, Altice brings an action pursuant to the

---

3   The Court is not clear on the exact cause of action Altice attempts to state in its first count. The claim mentions (1) the Cable Act, (2) the Supremacy Clause of the Constitution, and (3) the Declaratory Judgment Act.  (ECF No. 17 ¶¶ 68, 69, 74.)  It is not clear that the Cable Act provides an implied private right of action for cable providers.  *Cf. Mallenbaum v. Adelphia Commcn's Corp.*, 74 F.3d 465, 469-70 (3d Cir. 1996) (holding that the Cable Act does not create an implied private right of action for cable subscribers).  As the Court previously noted, the Supremacy Clause of the Constitution does not provide a private right of action.  *See Altice*, 2019 WL 7047207, at *1 n.2 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015)).  Finally, the Declaratory Judgment Act does not create an independent cause of action.  *See In re AZEK Bldg. Prods., Inc., Mkt'g & Sales Pracs. Litig.*, 82 F. Supp. 3d 608, 624-25 (D.N.J. 2015).  At this time, the Court expresses no opinion concerning

Civil Rights Act of 1866, 42 U.S.C. § 1983. (ECF No. 17 ¶ 80.) Third, Altice brings an action to enforce an order of the Federal Communications Commission ("FCC") pursuant to 47 U.S.C. § 401(b).[4] (ECF No. 17 ¶ 87.) Fourth, Altice brings an action under New Jersey state law.[5] (ECF No. 17 ¶ 95.)

## II.    LEGAL STANDARD

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994).

In order to obtain a temporary restraining order or preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant

---

whether Altice's first count constitutes a valid cause of action because its claim under 42 U.S.C. § 1983 provides a valid basis for the issuance of the injunction.

4    At oral argument, Altice identified the FCC's "orders" that Altice sought to enforce as the series of orders between 2002 and 2010 in which the FCC found that Cablevision was subject to effective competition. (ECF No. 17-1, at 2 n.2.). Under § 401(b), this Court may enforce an FCC "order," but not a rule or regulation. *See Mallenbaum*, 74 F.3d at 468-69. At this time, the Court expresses no opinion concerning whether the Commission's findings constitute enforceable "orders" or unenforceable rules or regulations because 42 U.S.C. § 1983 provides a valid basis for the issuance of the injunction.

5    Federal courts may not grant injunctive relief against state officials for violations of state law. *See, e.g.*, *N.J. Primary Care Ass'n v. N.J. Dep't of Human Servs.* ("*NJPCA*"), 722 F.3d 527, 536 (3d Cir. 2013) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). At this time, the Court need not determine whether this principle impacts Altice's fourth claim because of the valid federal basis for the preliminary injunction.

a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

## III. DECISION

### A. Jurisdiction

Defendants argue that this Court lacks subject matter jurisdiction over this action. The Court disagrees.

A district court has general federal question jurisdiction under 28 U.S.C. § 1331 as well as specific civil rights jurisdiction under 28 U.S.C. § 1343 over claims made under 42 U.S.C. § 1983. *See, e.g.*, *Houser v. Folino*, 927 F.3d 693, 697 (3d Cir. 2019). Additionally, district courts have jurisdiction over claims under § 401(b) of the Communications Act of 1934, because that provision provides its own grant of jurisdiction. *See* 47 U.S.C. § 401(b). When a district court has original jurisdiction over any claim, the court also has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

This Court has jurisdiction over Altice's claims under all these provisions. Altice brings a claim under 42 U.S.C. § 1983, giving this Court general federal question jurisdiction as well as

specific civil rights jurisdiction over the § 1983 claim. Additionally, Altice makes a claim under § 401(b) of the Communications Act, which provision gives the Court jurisdiction over that claim. The Court has supplemental jurisdiction over the remaining claims.

**B.    Sovereign Immunity**

Defendants argue that they are entitled to sovereign immunity. The Court agrees that BPU is immune from suit in light of its status as a state agency but finds that the Board Members lack sovereign immunity because Altice seeks prospective relief against them to end an ongoing violation of federal law.

**1.    Bureau of Public Utilities**

The Supreme "Court's cases have recognized that the immunity of States from suit 'is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the Convention or certain constitutional Amendments.'" *N. Ins. Co. of N.Y. v. Chatham Cty., Ga.*, 547 U.S. 189, 193 (2006) (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999)). Sovereign immunity "immunizes from suit in federal court both non-consenting states and those entities that are so intertwined with them as to render them 'arms of the state.'" *Karns v. Shanahan*, 879 F.3d 504, 513 (3d Cir. 2018) (quoting *Bowers v. NCAA*, 475 F.3d 524, 545 (3d Cir. 2007)).

While courts can "apply an 'oft-reiterated' three-part test to determine 'whether an entity is an alter ego or arm of a state for purposes of [sovereign] immunity,'" courts should dispense with the three-part test and summarily determine that an entity qualifies for sovereign immunity when state law establishes the entity "as an administrative agency without existence apart from the" state. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 255 (3d Cir. 2010) (quoting *Christy*

*v. Pa. Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995)); *see also Wattie-Bey v. Att'y Gen.'s Office*, 424 F. App'x 95, 98 n.2 (3d Cir. 2011).

New Jersey's statutory law creates BPU as a state agency. *See* N.J. Stat. Ann. § 48:2-1. Accordingly, BPU is considered an arm of the state for purposes of sovereign immunity. *See Pa. Fed. of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) (holding that sovereign immunity "renders states—and, by extension, *state agencies and departments* and officials when the state is the real party in interest—generally immune from suit by private parties in federal court" (quoting *Alden*, 527 U.S. at 751) (emphasis added)).

Altice argues that the nature of its suit permits it to evade BPU's sovereign immunity. The Court disagrees. There are three exceptions to sovereign immunity: (1) congressional abrogation of sovereign immunity, (2) consent to waive sovereign immunity, or (3) action for prospective injunctive relief against state officials. *See M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 345 (3d Cir. 2003). None of the three exceptions applies to BPU.

### i. Congressional Abrogation of State Sovereign Immunity

First, Altice has not identified the law underlying any of its four claims as effecting a valid congressional abrogation of state sovereign immunity. Altice brings its first claim pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. (ECF No. 17 ¶ 74.) The Declaratory Judgment Act does not abrogate sovereign immunity. *See Dempsey v. United States*, Civ. No. 15-2847, 2015 WL 6561217, at *2 (D.N.J. Oct. 29, 2015).

Altice brings its second claim under 42 U.S.C. § 1983. (ECF No. 17 ¶ 80.) Altice fares no better under this venerable civil rights statute, because the provision limits its scope to suits

against "person[s]," and state agencies are not "persons" within the meaning of § 1983.  *See, e.g.*, *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 854 (3d Cir. 2014).

Altice's third claim comes under Federal Communications Act § 401(b), 47 U.S.C. § 401(b).  (ECF No. 17 ¶ 87.)  Enacted pursuant to Congress' power under the Commerce Clause, the Federal Communications Act cannot abrogate BPU's sovereign immunity because "the power 'to regulate Commerce' conferred by Article I of the Constitution gives Congress no authority to abrogate state sovereign immunity."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 672 (1999).

Altice cites a myriad of decisions in which courts have decided actions between private parties and state utility agencies.  (ECF No. 18-1, at 8-9 n.5.)  None of these decisions wrestles with the Supreme Court's more recent caselaw concerning the Commerce Clause and congressional abrogation of sovereign immunity.  *See Coll. Sav. Bank*, 527 U.S. at 672.  Accordingly, none of these decisions alters this Court's analysis.

Altice's fourth claim alleges violations of state statutory and state constitutional law. (ECF No. 17 ¶ 95.)  State law in whatever form—whether state statutes, state constitutional provisions, or state court procedural rules—cannot effect a congressional abrogation of sovereign immunity.  In order to validly abrogate state sovereign immunity, Congress must make its intention clear in the statute.  *See, e.g., Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012).  Congress does not enact state statutes, state court procedural rules, or state constitutional provisions, and so these provisions of state law cannot be expressions of congressional intent. While Congress has enacted a supplemental jurisdiction statute allowing for state law claims to be heard in federal court, *see* 28 U.S.C. § 1367, this federal statute does not abrogate state

sovereign immunity from state law claims.  *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541-42 (2002).

None of the law underlying Altice's four claims effects a valid abrogation of state sovereign immunity.  Accordingly, Altice cannot avoid BPU's sovereign immunity on the basis of congressional abrogation.

### ii.    State Waiver of Sovereign Immunity

Second, Altice does not argue that New Jersey has consented to federal suits by private parties against BPU.  This Court has not located any independent basis to believe that New Jersey has waived BPU's right to sovereign immunity.

### iii.    Prospective Injunctive Relief Against State Officials

Finally, Altice argues that sovereign immunity does not bar this action against BPU because Altice seeks prospective, not retrospective relief.  The Court disagrees.  The "exception [to sovereign immunity for suits seeking prospective relief] is narrow: It . . . has no application in suits against the States and their agencies, which are barred *regardless of the relief sought*."  *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (emphasis added); *see also Rhett v. Evans*, 576 F. App'x 85, 88 (3d Cir. 2014) (holding that sovereign immunity "protects a state or state agency from a suit brought in federal court regardless of the relief sought").  BPU is therefore still immune from Altice's suit, notwithstanding that Altice seeks prospective, not retrospective relief.

### 2.    Board Members

While sovereign immunity bars this action against state agencies like BPU, the same is not true of the individual commissioners[6]: sovereign immunity does not bar "[s]uits against *state*

---

6   Defendants argue that the Court should not permit Altice to amend its complaint to join all Board Members to this lawsuit, because Altice had an earlier opportunity to do so and failed. The Court disagrees.  A party is entitled to amend its Complaint within 21 days after service.

*officials* that seek prospective injunctive relief to end a violation of federal law." *Hammonds v. Dir., Pa. Bureau of Driver Licensing*, 618 F. App'x 740, 742 (3d Cir. 2015) (emphasis added).

To determine whether this exception to sovereign immunity applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)). "The label given to the requested relief is 'of no importance'— [courts] must 'look to the substance rather than the form of the relief requested' to determine if" the relief sought is prospective or retrospective. *Christ the King Manor, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013) (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir. 1996)).

Prospective relief, like an injunction, contrasts with retrospective relief, like damages (or a damages-like remedy). For instance, "injunctive relief requiring [state Medicaid officials] to reevaluate [plaintiff's] Medicaid application and find her eligible for benefits without a transfer penalty" constitutes retrospective damages-type relief because such an injunction would "award[] [plaintiff] Medicaid benefits that were withheld as a result of the imposition of transfer penalties, and those benefits would be paid out of State funds." *Williams ex rel. Bookbinder v. Connolly*, 734 F. App'x 813, 816 (3d Cir. 2018).

The relief Altice seeks is prospective, not retrospective. Altice seeks an injunction against the Board Members to require them to comply with federal law, going forward. The injunction would not entitle Altice to any money from the New Jersey state treasury, nor would an injunction retrospectively compensate Altice for any prior harm BPU has caused Altice.

---

Fed. R. Civ. P. 15(a)(1)(A). Altice met this deadline. Additionally, the Court explicitly granted leave for Altice to amend its Complaint. *See* Fed. R. Civ. P. 15(a)(2). Accordingly, Altice is entitled to amend its complaint to join all Board Members to this action.

Because Altice seeks prospective relief against state officials, sovereign immunity does not bar this action against the Board Members.

### B. Abstention

Defendants argue that this Court should abstain from exercising jurisdiction over this action. *See Younger v. Harris*, 401 U.S. 37, 44-45 (1971). The Court disagrees because the BPU's order regulating Altice's billing practices—the order with which this action might interfere—does not constitute a quasi-criminal proceeding.

The *Younger* abstention doctrine provides that federal courts should generally abstain from exercising jurisdiction over cases that seek to interfere with certain types of pending state litigation, when "the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 (1987). One qualifying type of state litigation is "civil enforcement proceedings." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 368 (1989).

A qualifying "civil enforcement proceeding" has certain characteristics. Traditionally, courts looked to three so-called *Middlesex* factors: (1) whether there was an ongoing state proceeding that was judicial in nature, (2) whether the state proceeding implicated important state interests, and (3) whether the state proceeding offered an adequate opportunity for the federal plaintiff to litigate federal constitutional challenges. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). However, recent decisions caution that "these three factors [are not] the alpha and omega of the abstention inquiry" and "were never intended to be independently dispositive."[7] *Gonzalez v. Waterfront Comm'n of N.Y. Harbor*, 755

---

[7] Defendants also argue that *Younger* imposes a requirement on federal plaintiffs that they exhaust their state remedies before initiating a federal action. This is not universally true. *Compare Huffman v. Pursue, Ltd.*, 420 U.S. 592, 1210-12 (1975) (requiring exhaustion when

F.3d 176, 182 (3d Cir. 2014); *see also Hamilton v. Bromley*, 862 F.3d 329, 337 (3d Cir. 2017). Before analyzing the *Middlesex* factors, courts must first determine whether the state proceedings possess a quasi-criminal character.[8]  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81 (2013).

"[Q]uasi-criminal proceedings of this ilk share several distinguishing features." *Gonzalez*, 755 F.3d at 181.  For instance, the proceeding will "characteristically [be] initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act." *Sprint Commc'ns*, 571 U.S. at 79.  This is more than simply "negative consequences."  *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 140 (3d Cir. 2014).  "Sanctions are retributive in nature and are typically imposed to punish the sanctioned party 'for some wrongful act.'"  *Id.* (quoting *Sprint Commc'ns*, 571 U.S. at 79). Sanctions must be more than the mere "cost of doing business, with the choice of whether to make such payment resting entirely with Plaintiffs."  *Id.*

Additionally, "a state actor [will] routinely [be] a party to the state proceeding and often initiates the action."  *Sprint Commc'ns*, 571 U.S. at 79.  "To be sure, the Supreme Court has not directly held that *Younger* applies only when a state actor files a complaint or formal charges." *ACRA Turf Club*, 748 F.3d at 140.  However, "the state's 'initiation' procedure must proceed with

---

the relief sought is to enjoin the enforcement of a state judgment) *with Wooley v. Maynard*, 430 U.S. 705, 710-11 (1977) (holding that exhaustion was not required when the relief sought would not invalidate any existing state judgment).  Even when *Younger* incorporates an exhaustion requirement, the underlying proceeding must still "be the sort of proceeding entitled to *Younger* treatment."  *NOPSI*, 491 U.S. at 369.  As discussed below, BPU's order is not the type of state proceeding to which *Younger* applies.

8    While quasi-criminal state proceedings are the most common category of cases involving *Younger*, the doctrine also applies to "ongoing state criminal prosecutions" and "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions."  *Sprint Commc'ns*, 571 U.S. at 78.  Neither party argues that BPU's order concerning Altice's billing practices falls into either category.

greater formality than merely sending a targeted advisory notice to a class of people that may be affected by new legislation." *Id.*

Often, "the proceeding [will be] both in aid of and closely related to criminal statutes." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). A proceeding is more likely to be quasi-criminal if "the State could have alternatively sought to enforce a parallel criminal statute" that "vindicates similar interests." *ACRA Turf Club*, 748 F.3d at 138; *see also Trainor v. Hernandez*, 431 U.S. 434, 444 (1977); *Gonzalez*, 755 F.3d at 182. For that reason, "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Sprint Commc'ns*, 571 U.S. at 79-80; *see also Gonzalez*, 755 F.3d at 182.

While quasi-criminal proceedings may share many attributes with actual criminal prosecutions, they will differ in one key respect: unlike a criminal prosecution, a quasi-criminal proceeding need not occur before the state's judiciary. To the contrary, abstention will apply "to state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim." *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627 (1986); *see also Gonzalez*, 755 F.3d at 182 (describing a state administrative proceeding as "a textbook example of a quasi-criminal action").

*Younger* abstention is inappropriate here because the state proceedings below lack a quasi-criminal character. BPU's order regulating Altice's billing practices is not designed to sanction Altice for any wrongful act. BPU's regulatory order did not follow any investigation nor does it constitute a formal complaint or criminal charge. Finally, Defendants have not identified any criminal statutes aided by or related to BPU's order regulating Altice's billing

practices. Accordingly, BPU's regulatory order does not constitute a quasi-criminal proceeding, and the Court may not abstain under *Younger*.

### C. Preliminary Injunction

Altice seeks a preliminary injunction. The Court will grant the issuance of a preliminary injunction because (1) Altice has a reasonable probability of eventual success in the litigation, (2) Altice will suffer irreparable injury in the absence of a preliminary injunction, (3) the possibility of harm to Defendants and to New Jersey cable subscribers by granting the injunction is minimal, and (4) the public interest is served in upholding the supremacy of federal law.

#### 1. Reasonable Probability of Eventual Success in the Litigation

Altice has a reasonable probability of success in the eventual litigation because BPU's order violates Cable Act. The Cable Act prohibits states from "regulat[ing] the services, facilities, and equipment provided by a cable operator except to the extent consistent with" the Cable Act. 47 U.S.C. § 544(a). The Cable Act expressly preempts any state regulation of cable operators that is inconsistent with the Cable Act. *Id.* § 556(c). Among other things, the Cable Act prohibits states from regulating "the rates for the provision of cable service" if the FCC finds that "the cable system is subject to effective competition." *Id.* § 543(a)(2). A requirement that service providers prorate bills is a type of rate regulation. *Cf. Windstream Neb., Inc. v. Neb. Pub. Serv. Comm'n*, No. CI 10-2399, 2011 WL 13359491, at *6 (D. Neb. June 9, 2011) (holding that, in the context of a Nebraska state law challenge by an intrastate wireline telecommunications provider, a state agency rule requiring prorated billing constitutes rate regulation); *In re Sw. Bell Mobile Sys., Inc.*, 14 FCC Rcd. 19898, 19908 (Nov. 24, 1999) (holding that 47 U.S.C. § 332(c)(3) bars states from "prohibit[ing] [commercial mobile radio service] providers from charging for

incoming calls or charging in whole minute increments" because such a charging scheme would constitute prohibited rate regulation).

BPU's order violates the Cable Act. In a series of orders between 2002 and 2010, the FCC found that Cablevision was subject to effective competition. (ECF No. 17-1, at 2 n.2.) In 2015, the FCC "adopt[ed] a rebuttable presumption that [all] cable operators are subject to Competing Provider Effective Competition." In re Amendment to Commission's Rules Concerning Effective Competition, 30 FCC Rcd. 6574, 6577 (June 3, 2015). Because Cablevision was subject to effective competition, BPU may not regulate the rates of Cablevision's successor Altice. 47 U.S.C. § 543(a)(2). BPU's order requiring Altice to prorate customer bills based on the exact dates of service constitutes rate regulation. *Cf. Windstream*, 2011 WL 13359491, at *6; *Sw. Bell Mobile Sys.*, 14 FCC Rcd. at 19908. Accordingly, the Cable Act preempts BPU's order[9] and Altice possesses a reasonable probability of success in the eventual litigation.

### 2. Irreparable Injury

Altice will also suffer irreparable injury if this Court does not grant a preliminary injunction. In order to implement its whole-month billing policy, Altice expended significant resources in both monetary terms and in terms of the time of its billing personnel. (ECF No. 17-3 ¶ 4.) Requiring Altice to switch back to prorated billing "would be exceptionally difficult and would require substantial investments in time, effort, and money that Altice could not recoup." (ECF No. 17-3 ¶ 6.) This is in part because compliance with BPU's order would require Altice

---

9    For the first time at oral argument, Defendants raised the issue of whether the Cable Act's explicit protection for state "consumer protection law[s]," 47 U.S.C. § 552(d)(1), saves the Prorated Bill Rule from the reach of the Cable Act's prohibition on state rate regulation of cable systems subject to effective competition. The Court "do[es] not consider this contention, as it was raised for the first time at oral argument and thus is waived." *Estate of Roman v. City of Newark*, 914 F.3d 789, 803 n.9 (3d Cir. 2019).

to maintain a New Jersey-specific billing system to operate alongside its nationwide billing system, and building such a system would take over a year, cost approximately $5 million, and interfere with Altice's plans to upgrade its existing billing systems. (ECF No. 17-3 ¶ 8.) Additionally, Altice would have to create a New Jersey-specific billing quality control system for its billing processes to operate alongside its nationwide quality control system, a task that would require Altice to hire two full-time equivalent employees to run the system and cost approximately $200,000 per year. (ECF No. 17-3 ¶ 9.) Altice would incur other costs: retraining its entire nationwide corps of 3,500 customer service agents on the unique rules for Altice's New Jersey customers, which would cost Altice approximately $200,000. (ECF No. 17-3 ¶ 10.) Altice would incur other, unenumerated costs, such as the loss of customer goodwill and the cost of locating its former customers in order to issue refunds. (ECF No. 17-3 ¶¶ 11-12.)

These monetary costs will irreparably harm Altice.[10] While monetary consequences are usually insufficient to constitute irreparable harm (because they can be reimbursed), the same is not true of "unredressable financial consequences." *Pa. v. Pres. of the United States*, 930 F.3d 543, 574 (3d Cir. 2019). "[F]inancial consequences" are "unredressable" when the law prohibits the party seeking the injunction from recouping the value of those financial consequences via damages from its opponents in the litigation. *See id.*

This is precisely the situation in which Altice finds itself. If Altice incurs these compliance expenditures, it will be unable to recover damages from BPU (a state agency) or the Board Members (state officials in their official capacity), because sovereign immunity would bar

---

10 At oral argument, counsel for Defendants suggested that Altice will not suffer irreparable harm as a result of modifying its billing systems because it has previously, successfully modified its billing systems from prorated billing to whole-month billing. Whatever the merits of this argument, Defendants do not put forward any record evidence concerning the cost Altice will bear if forced to transition back to a prorated billing system, and the statements at oral argument of Defendants' counsel are not evidence. *See, e.g.*, *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1372 (3d Cir. 1996).

recovery. *See Williams v. Sec'y, Pa. Dep't of Corr.*, 848 F.3d 549, 572 n.151 (3d Cir. 2017) (state officials); *MCI Telecommc'ns Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 503 (3d Cir. 2001) (state agencies). Because the law prohibits Altice from recouping its compliance expenses from BPU or the Board Members, Altice's financial consequences are unredressable, and the harm Altice faces is irreparable.

### 3.    Harm to Defendants and New Jersey Cable Subscribers

The potential harm from the issuance of the injunction is minimal. This is true of both Defendants and non-parties.

The set of non-parties impacted by a preliminary injunction is limited to Altice's former cable subscribers in New Jersey who did not receive a prorated bill[11]—not all New Jersey citizens or even all New Jersey cable subscribers. Their harm is limited to a prorated refund of the amount of their final Altice cable bill, which presumably they would receive if the Court allowed BPU's order to remain in effect. This harm may only be temporary: if the Court declines to issue a permanent injunction at the conclusion of this litigation, or if an appellate court overturns this Court's preliminary injunction, Altice's former customers can still receive compensation for their financial injury.

Defendants do not argue that either BPU or the Board Members will suffer any financial or logistical consequences. The Defendants will suffer a less concrete harm: the issuance of the preliminary injunction intrudes into the sovereignty of the State of New Jersey. But the Court's

---

[11] Counsel for Defendants represents that BPU received over 100 customer complaints concerning Altice's switch from prorated billing to whole-month billing. (ECF No. 8, at 13.) The Court cannot consider this fact because statements appearing in legal briefs are not evidence. *See, e.g.*, *Liszewski v. Moyer Packing Co.*, 252 F. App'x 449, 451 (3d Cir. 2007) (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)).

order does nothing more than enforce federal law, so the intrusion into New Jersey's sovereignty is no greater than the intrusion from Congress' enactment of the Cable Act.

Because of the minimal harm to New Jersey's sovereignty that the preliminary injunction will impose on Defendants, the small class of non-parties who will suffer harm as a result of this preliminary injunction, as well as the temporary nature and *de minimis* degree of the harm to the non-parties, this factor weighs in favor of granting the preliminary injunction.

### 4. Public Interest

The public interest favors granting the preliminary injunction because doing so will minimize the potential for consumer confusion. Preventing confusion is in the public interest. *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *Constr. Ass'n of W. Pa. v. Kreps*, 573 F.3d 811, 820 (3d Cir. 1978). If this Court declines to grant a preliminary injunction, BPU will enforce its order requiring Altice to prorate its customers' bills. However, if the Third Circuit later reverses this Court's denial of the preliminary injunction or this Court issues a permanent injunction at the conclusion of the litigation, BPU will be unable to enforce the Prorated Bill Rule, and Altice will likely cease prorating its customers' bills. This legal back and forth will create confusion among Altice's customers. (ECF No. 17-3 ¶ 11.) Avoiding that confusion by granting the preliminary injunction weighs in the public interest.

### 5. Review of All Factors

Having found that all four factors weigh in favor of granting the preliminary injunction, the Court necessarily must find that "the four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

### D. Security for Potentially Wrongful Injunction

Defendants' counsel suggested in passing at oral argument that the Court, should it grant

the preliminary injunction, must also require Altice to post a bond.[12]  The Court agrees, and will

require Altice to post a $2.11 million bond.

"The court may issue a preliminary injunction . . . only if the movant gives security in an

amount that the court considers proper to pay the costs and damages sustained by any party

found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  This Court must

"interpret this requirement strictly."  *Globus Med., Inc. v. Vortex Spine*, LLC, 605 F. App'x 126,

129 (3d Cir. 2015).  "[W]hile there are exceptions, the instances in which a bond may not be

required are so rare that the requirement is almost mandatory."  *Scanvec Amiable Ltd. v. Chang*,

80 F. App'x 171, 175 (3d Cir. 2003) (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors

Corp.*, 847 F.2d 100, 110 (3d Cir. 1988)).  The "'extremely narrow exception' allowing for

waiver of the bond requirement" exists "only 'when complying with the preliminary injunction

raises no risk of monetary loss to the defendant,' and the District Court 'make[s] specific

findings' in support of that conclusion."  *Tilden Rec. Vehs., Inc. v. Belair*, 786 F. App'x 335, 343

(3d Cir. 2019).   If the Court finds that the movant must post a bond, "the amount of the bond is

left to the discretion of the court."  *Frank's GMC Truck Ctr.*, 847 F.2d at 103.

A $2.11 million bond is appropriate in this case.  If the Court wrongfully enjoins the

Board Members, Defendants will incur substantial increased litigation costs, their constituent

cable subscribers will be denied prorated refunds of their last months' Altice cable bills, and

Defendants will have suffered a significant, needless intrusion into New Jersey's state

sovereignty.[13]  Given the scope of the issues in this case, including the expenditures at stake for

---

12  "I would suggest that were the Court to grant injunctive relief over the state of New Jersey's
    objection, that perhaps there would be necessarily some type of financial ramification to that
    that should be considered by the Court."  Unofficial Tr. of Oral Arg. (Jan. 10, 2020).

13  The Court noted earlier that the issuance of the preliminary injunction would intrude only
    minimally into New Jersey's state sovereignty, because the preliminary injunction's intrusion
    is no greater than the imposition on state sovereignty already imposed by the Cable Act.  *See*

Altice, for Altice's customers, and the sovereignty harms at issue for Defendants, $2.11 million is the most appropriate bond amount. Accordingly, the Court will require Altice to post a $2.11 million bond as a condition of issuing the preliminary injunction.

### E.    Duration of Preliminary Injunction

Having decided to issue a preliminary injunction, the Court must decide for how long the preliminary injunction will remain in force. No party addresses this topic. The Court finds that the preliminary injunction should last until the earlier of the conclusion of this litigation or until circumstances render the injunction unnecessary.

An injunction should last no longer than necessary to achieve the injunction's goals. *See Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 281 (3d Cir. 2019); *SI Handling Sys., Inc. v. Heisley*, 753 F.3d 1244, 1266 (3d Cir. 1985). This Court must tailor the injunction's duration to take account of potential changes in circumstances that would impact the continued necessity of the injunction. *See Par Pharm.*, 764 F. App'x at 281; *SI Handling Sys.*, 753 F.3d at 1266. The factors that support the issuance of an injunction "do[] not necessarily support an indefinite injunction." *Par Pharm.*, 764 F. App'x at 281.

The unique circumstances of this case require that the Court place limits on the duration of the injunction. First, the injunction will last only so long as Altice is subject to effective competition. If Altice ceases to be subject to effective competition, the injunction will no longer be necessary because the Cable Act will no longer preempt state cable rate regulation. 47 U.S.C. § 543(a)(2). Likewise, if Congress repeals or a court invalidates any of the relevant provisions of the Cable Act, the injunction will no longer be necessary because there will be no relevant provision of the Cable Act to enforce.

---

part III.C.3, *supra*. This analysis changes if an appellate court were to find that this Court *wrongfully* enjoined the Board Members, because an unlawful injunction intrudes more significantly into state sovereignty than a lawful injunction.

Although certain changes in circumstances would render the injunction unnecessary, a strict time limit on the injunction would not be appropriate. BPU's order has no end date. (ECF No. 17-7, at 9.) BPU's order enforces a provision of the New Jersey Administrative Code which has no expiration or sunset date. *See* N.J. Admin. Code § 14:18-3.8(c). Accordingly, absent the circumstances listed above, this preliminary injunction should remain in place through the conclusion of this litigation.

IV. **CONCLUSION**

For the reasons set forth above, the Court treats Altice's Motion for Reconsideration as a Motion for Preliminary Injunction, will **DENY** the motion as to BPU, and will **GRANT** the motion as to the Board Members (subject to Altice posting a $2.11 million bond). The Court will issue the preliminary injunction after reviewing Altice's proposed form of order.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated: January 22, 2020