<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| ALTICE USA, INC., | : | |
|  | : | |
| Plaintiff, | : | |
| v. | : | Case No. 3:19-cv-21371-BRM-ZNQ |
|  | : | |
| JOSEPH L. FIORDALISO, in his official capacity as President of the New Jersey Board, of Public Utilities, AND MARY-ANNA, DIANNE SOLOMON, UPENDRA J. CHIVUKULA, AND BOB M. GORDON, in their official capacities as Commissioners of the New Jersey Board of Public Utilities, | : | |
|  | : | **OPINION** |
| Defendants. | : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiff's Altice USA, Inc.'s ("Altice") Motion for Judgment on the Pleadings (ECF No. 48), and a Cross-Motion to Dismiss filed by Defendants New Jersey Board of Public Utilities ("BPU"), its president Joseph L. Fiordaliso ("President Fiordaliso"), and its four commissioners Mara-Anna Holden, Dianne Soloman, Upendra J. Chivukula, and Bob M. Gordon (all individual Defendants collectively, "Board Members") (Board Members and BPU collectively, "Defendants") (ECF No. 50). Defendants opposed Altice's Motion. (ECF No. 50.) Altice filed a Reply (ECF No. 51) and a Notice of Supplemental Authority (ECF No. 52) in support of its Motion. Defendants filed a letter as a Notice of Supplemental Authority. (ECF No. 54.) Altice responded to Defendants' letter. (ECF No. 56.) Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule

of Civil Procedure 78(b), for the reasons set forth below and for good cause appearing, Altice's Motion for Judgment on the Pleadings is **GRANTED**, and Defendants' Cross-Motion to Dismiss is **DENIED**.

## I. BACKGROUND

The factual background of this litigation is summarized the January 22, 2020 Opinion (ECF No. 25)[1] and will not be repeated here. The Court will only address the procedural history associated with the present motions.

On August 21, 2020, Altice filed a Motion for Judgment on the Pleadings (ECF No. 48) pursuant to Federal Rule of Civil Procedure 12(c) on Counts I, II, and III of its Amended Complaint (ECF No. 17). On September 18, 2020, Defendants filed a Brief in opposition to Altice's Motion and in support of a Cross-Motion to Dismiss Altice's Amended Complaint. (ECF No. 50.) On September 28, 2020, Altice filed a Reply in support of its Motion. (ECF No. 51.) On October 9, 2020, Altice filed a Notice of Supplemental Authority. (ECF No. 52.) On October 27, 2020, Defendants filed a letter as a Notice of Supplemental Authority. (ECF No. 54.) On November 5, 2020, Altice responded to Defendants' letter. (ECF No. 56.)

## II. LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The difference between Rules 12(b)(6) and 12(c) is purely procedural as 12(c) requests for dismissal are governed by the same standards as 12(b)(6) motions." *Glob. Naps, Inc. v. Bell Atl.-N.J., Inc.*, 287 F. Supp. 2d 532, 539 (D.N.J. 2003) (citing *Turbe v. Gov't of the V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)). As with a Rule 12(b)(6)

---

[1] *Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, No. 3:19-cv-21371, 2020 U.S. Dist. LEXIS 10433 (D.N.J. Jan. 22, 2020).

motion, in deciding a 12(c) motion, the court must "view the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the" nonmovant. *Barnard v. Lackawanna Cty.*, 696 F. App'x 59, 61 (3d Cir. 2017) (internal quotations and citations omitted). A court may only grant a motion for judgment on the pleadings if the moving party "clearly establishes that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)).

### III.   DECISION

Altice's Motion for Judgment on the Pleadings turns on a pure question of law, namely, whether the Cable Communications Policy Act of 1984 ("Cable Act") preempts the proration requirement in N.J.A.C 14:18-3.8(c). (ECF No. 48-1 at 8, 15.) In other words, there is no material factual dispute before the Court.

#### A.   *Younger* Abstention Is Inapplicable Here

Defendants argue the Court should abstain from hearing Altice's federal preemption claim, because Altice first appealed BPU's November 23, 2019 order ("BPU's Order") to the New Jersey Superior Court, Appellate Division before commencing litigation before this Court. (ECF No. 50 at 6, 9.) Defendants maintain an abstention under *Younger* and its progeny is warranted here, because BPU's Order involved a civil enforcement proceeding originating from an investigation and culminating in formal action by BPU, a state actor, which sanctioned Altice for a wrongful act, i.e., refusal to change its billing practices to comply with New Jersey law. (*Id.* at 14–15 (citing *Younger v. Harris*, 401 U.S. 37 (1971)).) Defendants contend New Jersey's state interest in consumer protection is a sufficient cause for abstention under *Younger*. (*Id.* at 16–17.) Defendants assert the Cable Act leaves states with the authority to enact consumer protections laws. (*Id.* at 9,

3

18.) Altice contends *Younger* abstention is inappropriate where, as here, a preemption challenge was raised against a state utility board order. (ECF No. 51 at 7.) Altice insists there is a strong federal interest in ensuring BPU's compliance with the national policy concerning cable communications. (*Id.* at 8.) Altice claims *Younger* abstention applies only where the dispute is the subject of an ongoing state criminal proceeding or a state proceeding akin to a criminal prosecution, which is different from BPU's regulatory proceeding. (*Id.* at 8, 10.) The Court agrees.

"Generally, a federal court's obligation to hear and decide a case is virtually unflagging." *PDX North, Inc. v. Comm'r N.J. DOL & Workforce Dev.*, 978 F.3d 871, 882 (3d Cir. 2020) (citing *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)) (internal quotations omitted). "*Younger* abstention is an exception to that rule that applies when certain types of state proceedings are ongoing at the time a federal case is commenced." *Id.* (citing *Sprint*, 571 U.S. at 77). *Younger* abstention applies "only when federal litigation threatens to interfere with one of three classes of cases: (1) state criminal prosecutions, (2) state civil enforcement proceedings, and (3) state civil proceedings involving orders in furtherance of the state courts' judicial function." *Acra Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014) (citing *Sprint*, 571 U.S. at 81). Here, Defendants admit the underlying state proceeding is a civil enforcement proceeding. (ECF No. 50 at 14.)

"As to the civil enforcement requirement, after *Sprint*, the threshold condition for applying *Younger* abstention is that the state civil enforcement proceeding must be quasi-criminal in nature." *McNamara v. Grewal*, No. 19-173, 2019 U.S. Dist. LEXIS 188288, at *14 (D.N.J. Oct. 29, 2019) (citing *Acra Turf*, 748 F.3d at 138) (internal quotations omitted); *see also Grafas v. Borough of Brielle*, No. 3:19-cv-9467, 2020 U.S. Dist. LEXIS 87655, at *12 (D.N.J. May 19, 2020) ("Pursuant to *Sprint*, to be considered a 'civil enforcement proceeding,' the state proceeding must generally

4

be 'akin to a criminal prosecution' and, if it is, is therefore said to be 'quasi-criminal' in nature.")
(citing *Sprint*, 571 U.S. at 78).

> In evaluating whether a state proceeding is quasi-criminal, we consider the factors set out in *Sprint*, including whether (1) the action was commenced by the State in its sovereign capacity, (2) the proceeding was initiated to sanction the federal plaintiff for some wrongful act, and (3) there are other similarities to criminal actions, such as a preliminary investigation that culminated with the filing of formal charges.

*Acra Turf*, 748 F.3d at 138 (citing *Sprint*, 571 U.S. at 79–80). Here, the Court need not rearticulate the reasons for the conclusion drawn in the January 22, 2020 Opinion that "*Younger* abstention is inappropriate here because the state proceedings below lack a quasi-criminal character." (ECF No. 25 at 13.) Because the underlying state proceeding does not meet the threshold condition of being quasi-criminal, the Court need not consider other issues relevant to the *Younger* abstention determination, such as whether the state interest in consumer protection is a sufficient cause to trigger *Younger* abstention.

Defendants' invocation of *PDX North* does not change the conclusion. (ECF No. 54 at 1 (citing *PDX North*, 978 F.3d 871).) The *PDX North* court found the relevant "underlying proceedings [we]re civil enforcement actions that [we]re quasi-criminal in nature," when all the "three factors described in *Sprint*" supported such a finding. *PDX North*, 978 F.3d at 883. But this is not the case here, because the third *Sprint* factor weighs against finding BPU's civil enforcement action quasi-criminal. The inquiry under the third *Sprint* factor is "whether there is a criminal analog" to the underlying civil enforcement action, *id.* at 884, i.e., whether "the policies implicated in the state proceeding could have been vindicated through enforcement of a parallel criminal statute." *Acra Turf*, 748 F.3d at 139. Here, the Court does not discern, and "Defendants have not identified[,] any criminal statutes aided by or related to" BPU's Order. (ECF No. 25 at 13.)

"Abstention is, therefore, not appropriate on this basis, alone." *McNamara*, 2019 U.S. Dist. LEXIS 188288, at *13–14 (finding the defendants have not "demonstrated a qualified civil enforcement under the *Younger* abstention doctrine," because "there [wa]s no indication that the policies implicated in the state proceeding could have been vindicated through enforcement of a parallel criminal statute," even though "the [enforcement] action was commenced by the State, after an investigation, to sanction Plaintiffs for certain alleged wrongful act").

In conclusion, *Younger* abstention is inapplicable here.

### B. The Cable Act Expressly Preempts N.J.A.C. 14:18-3.8(c)

#### 1. A Presumption Against Preemption Is Warranted

Defendants maintain a presumption against preemption is warranted when considering a state action such as the enforcement of N.J.A.C. 14:18-3.8(c), which is a consumer protection law under a state's traditional police power. (ECF No. 50 at 20–21.) Defendants claim such a presumption can only be overcome by a clear and manifest Congressional purpose, a burden that Altice cannot meet. (*Id*. at 22.) Altice counters the clarity of the Cable Act would overcome any presumption. (ECF No. 51 at 12.) Altice argues the Congress has expressly preempted rate regulation of cable providers in jurisdictions with effective competition, where no presumption comes into play. (*Id*. at 13.) The Court finds a presumption against preemption is applicable here.

"In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005) (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). This is "often referred to as a 'presumption against preemption," which "holds even where an express preemption provision is in play." *Roth v. Norfalco LLC*, 651 F.3d 367, 375 (3d Cir. 2011) (citations omitted). "If the

preemptive scope of the statute is clear, however, 'the presumption against preemption can be overcome.'" *Id.* (citing *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 240 (3d Cir. 2009)). This presumption requires courts "to accept 'a plausible alternative reading . . . that disfavors preemption.'" *In re Federal-Mogul Global*, 684 F.3d 355, 369 (3d Cir. 2012) (citing *Bates*, 544 U.S. at 449); *see also MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 489 (3d Cir. 2013) (citing *Franks Inv. Co. v. Union Pacific R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010)) ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption."). Because "consumer protection is a field that states have traditionally occupied," *Pennsylvania v. Navient Corp*, 967 F.3d 273, 294 (3d Cir. 2020) (citations omitted), a presumption against preemption applies to the preemption inquiry of N.J.A.C. 14:18-3.8(c). However, this court concludes the language of the Cable Act is clear enough to overcome this presumption.

### 2. N.J.A.C. 14:18-3.8(c) Impermissibly Regulates the Rate of Cable Service

Defendants contend N.J.A.C. 14:18-3.8(c) is regulating the rates for the provision of cable service, because it only regulates the method of billing even if it indirectly affects rates. (ECF No. 50 at 22.) Defendants assert BPU's Order would only be preempted if it approaches the actual regulation of rates. (*Id.* at 23.) Defendants indicate a state law is not regulating rates for the provision of cable service, when the service is removed and the billing ceases. (*Id.* at 25.) Altice argues any provision of New Jersey law that regulates the rates for the provision of cable service is preempted. (ECF No. 48-1 at 17.) Altice maintains N.J.A.C. 14:18-3.8(c) regulates its rates for the provision of cable service, because N.J.A.C. 14:18-3.8(c) forces Altice to sell its service by the day at the same rate it sells its service by the month; such a proration requirement is an impermissible regulation on rate structure. (*Id.* at 18–19.) Altice explains it bills subscribers in

7

advance for one month of cable service before providing that service to subscribers, which means the final monthly charge BPU seeks to regulate is for the provision of cable service that the customer has already agreed to purchase. (ECF No. 51 at 14.) The Court agrees.

The Cable Act unambiguously provides:

> If the [Federal Communications Commission ("FCC")] finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by the [FCC] or by a State or franchising authority under this section.

47 U.S.C. § 543(a)(2). Because the FCC found Cablevision was subject to effective competition, BPU may not regulate the rates of Cablevision's successor Altice (ECF No. 25 at 15), which Defendants do not dispute. Since 47 U.S.C. § 543(a)(2) is triggered, any New Jersey statute that regulates the rates for the provision of Altice's cable service is expressly preempted, which is the case with N.J.A.C. 14:18-3.8(c).

Here, BPU's Order was an enforcement of a New Jersey statute that requires cable providers to prorate their bills for cable television service "as of the date of the initial establishment and final termination of service." N.J.A.C. 14:18-3.8(c). This constitutes an impermissible regulation of Altice's rates for the provision of cable service. Though BPU's Order and N.J.A.C. 14:18-3.8(c) only restrict Altice's billing for "the month in which a subscriber cancels her cable service, its prohibition on charges for service that was not provided have the effect of prescribing a daily rate for the service that was provided before the cancellation." *Spectrum Northeast LLC v. Frey*, No. 1:20-cv-00168-JDL, 2020 U.S. Dist. LEXIS 186060, at *12–13 (D. Me. Oct. 7, 2020). Therefore, N.J.A.C. 14:18-3.8(c) "regulates the rates that [Altice] charges 'for the provision of cable service' under § 543(a)(2)." *Id*.

This proration requirement has been regarded as a rate regulation under a similar context

other than § 543(a)(2). *Windstream Neb., Inc. v. Neb. Pub. Serv. Comm'n*, No. CI 10-2399, 2011 WL 13359491, at *6 (D. Neb. June 9, 2011) (finding a Nebraska statute was "an attempt by [the Nebraska Public Service Commission] to review, approve, or alter [a telecommunication service provider's] basic local exchange service rate," because it requires "that during the last month of a customer's service, [the telecommunication service provider] must change its rate from a monthly fixed rate to a daily rate so that the rate can be prorated").

Defendants' reliance on *Finneran* does not change the analysis. (ECF No. 50 at 24–25 (citing *Cable Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91 (2d Cir. 1992)).) Defendants claim the *Finneran* court found a New York statute—which restricted the fees a cable company could charge to customers who wished to downgrade their service—was not regulating rates for the provision of cable service, because no service was provided when it was removed. (*Id.* at (citing *Finneran*, 954 F.2d at 93, 99).) However, as set forth in Spectrum:

> *Finneran* is distinguishable. The downgrade fees at issue in *Finneran* were akin to deinstallation fees, charged in addition to the cable provider's monthly rates for the provision of cable service. *See Finneran*, 954 F.2d at 93. Because the downgrade fees and the rates for the ongoing provision of cable service were independent, the state's prohibition on downgrade fees did not directly regulate the rates charged by the cable provider at any time, whether before or after the downgrade request was made. *See id*. at 98–100. Unlike the state law at issue in *Finneran*, [N.J.A.C. 14:18-3.8(c)] does not regulate a one-time cancellation or deinstallation fee but operates directly on the rate that [Altice] may charge for providing a certain quantity of cable service before a customer cancels service.

*Spectrum Northeast*, 2020 U.S. Dist. LEXIS 186060, at *12. Accordingly, The Court finds N.J.A.C. 14:18-3.8(c) is a rate regulation of cable service unambiguously and expressly preempted by the Cable Act.

### 3. The Cable Act's Savings Clauses Do Not Change The Conclusion

Defendants argue N.J.A.C. 14:18-3.8(c) is permissible under the Cable Act's savings

9

clauses in 47 U.S.C. 552(d), which provide: (1) states may continue to promulgate and enforce consumer protection laws that are not otherwise expressly preempted, and (2) states may impose customer service requirements such as those related to disconnecting of a cable service and rebates and credits to consumers. (ECF No. 50 at 22, 24.) Altice insists the Cable Act does not permit a state to engage in rate regulation by justifying the regulation on consumer protection or consumer service grounds: any state law that constitutes rate regulation is itself preempted regardless whether it is labelled as a consumer protection or customer service measure. (ECF No. 48-1 at 23, 25.) Altice further posits BPU's Order, which imposes substantive limits on Altice's rate structure, is not a state customer service requirement permitted by the Cable Act. (*Id*. at 24–25.) The Court agrees.

The first saving clause provides, "Nothing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter." 47 U.S.C. § 552(d)(1). Because 47 U.S.C. § 543(a)(2), which is in the same "Cable Communications" subchapter with 47 U.S.C. § 552(d)(1), specifically preempts a state regulation of the rates for the provision of cable service under effective competition, 47 U.S.C. 552(d)(1) cannot be invoked to permit N.J.A.C. 14:18-3.8(c) as a state consumer protection law. *See* 47 U.S.C. § 543(a)(2). Describing N.J.A.C. 14:18-3.8(c) "as a consumer protection law does not aid in determining whether [it] is preempted by § 543(a)(2)— it simply begs the question." *Spectrum Northeast*, 2020 U.S. Dist. LEXIS 186060, at *14.

The second saving clause provides, "Nothing in this section shall be construed to preclude a franchising authority and a cable operator from agreeing to customer service requirements that exceed the standards established by" the FCC. 47 U.S.C. § 552(d)(2). However, N.J.A.C. 14:18-3.8(c)

10

cannot be characterized as a "law concerning customer service" for purposes of § 552(d)(2) because it does not "impose[] customer service requirements" on cable operators. Section 552(b) indicates that "customer service requirements . . . include, at a minimum, requirements governing (1) cable system office hours and telephone availability; (2) installations, outages, and service calls; and (3) communications between the cable operator and the subscriber (including standards governing bills and refunds)." The only one of these requirements that might plausibly allow a state to impose a proration requirement is paragraph 552(b)(3), which addresses "communications between the cable operator and the subscriber (including standards governing bills and refunds)." Although paragraph 552(b)(3) includes the phrase, "standards governing bills and refunds," it uses the phrase only as a parenthetical modifier of the primary term, "communications between the cable operator and the subscriber." *Id*. Thus, when read in context, § 552(b)(3) is limited to customer service requirements governing communications implicating bills and refunds, such as the time within which operators must issue refunds. *See* 47 C.F.R. 76.309(c)(3) (2020). It does not suggest that requirements governing the availability or structure of refunds qualify as "customer service requirements."

Of course . . . the meaning of "customer service requirements" is not limited by the examples set forth in §§ 552(b)(1)-(3). . . . Further . . . the legislative history of the Cable Act supports the view that "customer service requirements" may encompass some requirements that cable operators provide rebates and credits to subscribers.

. . .

[However,] [a]lthough the [N.J.A.C. 14:18-3.8(c)'s] method of regulation—a mandatory rebate—may be contemplated or authorized by § 552(d)(2), the substance that [N.J.A.C. 14:18-3.8(c)] regulates—the increment by which a cable operator must bill for cable service—is unambiguously prohibited by § 543(a)(2), and nothing in the statutory text or legislative history of § 552(d)(2) suggests that it creates an exception to that prohibition.

. . .

[T]he overarching purposes of the Cable Act [is] to "establish a national policy concerning cable communications" and to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems." 47 U.S.C. § 521(1), (3). If [N.J.A.C. 14:18-3.8(c)] were interpreted as a "customer service" law that is permitted under § 552(d)(2) of the Cable Act, rather than a rate regulation that is prohibited by § 543(a)(2), those purposes would be undermined. States could regulate cable service rates under the guise of imposing customer service requirements, for

>
> instance, by requiring rebates and credits for different bundling and subscription selections, creating a risk of inconsistent local and regional policies and increasing the potential for confusion regarding the relationship between federal, state, and local authorities.

*Spectrum Northeast*, 2020 U.S. Dist. LEXIS 186060, at *15–18. Accordingly, 47 U.S.C. § 552(d)(2) cannot be invoked to permit N.J.A.C. 14:18-3.8(c) as a customer service requirement.

Therefore, the saving clauses do not affect the Cable Act's express preemption over N.J.A.C. 14:18-3.8(c). Altice's Motion for Judgment on the Pleadings is granted, and Defendants' Cross-Motion to Dismiss is denied as moot.

### IV. CONCLUSION

For the reasons set forth above, Altice's Motion for Judgment on the Pleadings is **GRANTED**, and Defendants' Cross-Motion to Dismiss is **DENIED**. An appropriate order will follow.


**Date: March 23, 2021**                    */s/ Brian R. Martinotti*
                                             **HON. BRIAN R. MARTINOTTI**
                                             **UNITED STATES DISTRICT JUDGE**